**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JASON LEOPOLD, | |
| Plaintiff, | |
| v. | Civil Action No.  14-48 (JEB) |
| CENTRAL INTELLIGENCE AGENCY, | |
| Defendant. | |

**MEMORANDUM OPINION**

The Central Intelligence Agency's former detention and interrogation program has generated no small amount of controversy over the last decade.  In this Freedom of Information Act suit, Plaintiff Jason Leopold seeks access to what he refers to as an "internal study" that the agency drafted about the program.  The CIA has refused to release the series of documents that comprise the so-called study, contending that they are fully exempt from disclosure under FOIA Exemption 5 and that portions of them may also be withheld under Exemptions 1 and 3.  The government and Leopold have now cross-moved for summary judgment.  Because the Court finds that the CIA's invocation of Exemption 5 is sound, it will grant the agency's Motion and deny Plaintiff's.

I.      **Background**

In March 2009, the Senate Select Committee on Intelligence announced plans to review the CIA's former detention and interrogation program.  See Def. Mot., Exh. 1 (Declaration of Martha M. Lutz, Chief of the Litigation Support Unit, CIA), ¶ 11.  As part of this effort, the Committee negotiated with the CIA for certain of its staff members to have "unprecedented direct access to millions of pages of unredacted CIA documents."  Id.  In light of this agreement,

1

and in anticipation of the numerous policy decisions that senior officials would need to make in connection with the Committee's investigation, then-Director of the CIA Leon Panetta "expressed a desire to remain informed about what was contained in the millions of pages of documents that would be made available to the Committee." Id., ¶ 13.  In particular, "Panetta and other senior CIA leaders wished to be informed of noteworthy information" that could help "inform other policy decisions related to the Committee's study." Id.

A Special Review Team was thus formed to review the documents being turned over and to "prepar[e] summaries of certain key information." Id., ¶ 14.  The SRT's composition changed over time, but it generally included ten employees and contractors.  The team leaders would assign team members research topics, some of which related to particular detainees and some of which related to "overarching programmatic subject-matters." Id., ¶ 15.  Team members would then conduct searches for documents "related to their assigned topic" and review them to "determine[] whether certain contents of those documents might be relevant to informing senior CIA leaders in connection with the SSCI's study." Id.  If a team member found information that she "believed was significant" about her topic, she would describe the information in her Review. Id.  "The intent, over time, was for each Draft Review to become a rough guide to noteworthy information on a particular topic," which would help guide senior CIA leaders' "policy decisions." Id.

The project was abandoned, however, after only a year.  The agency determined that its "continued work on the Reviews could potentially complicate a separate criminal investigation by the Department of Justice into the detention and interrogation program." Id., ¶ 18.  As a result, the Reviews were never finished. Id., ¶ 19.  Indeed, when the project was cast aside, they "covered less than half of the millions of pages of documents that the CIA ultimately made

available to the SSCI." <u>Id.</u>  The Reviews themselves were also left in varying states.  Some, for instance, consisted of "only rough notes regarding some relevant documents." <u>Id.</u>  "Other[s] . . . were in a more polished form[,]" having "undergone preliminary editing and formatting in preparation for their review by the Chief of the Director's Review Group." <u>Id.</u>  According to the agency, had the project not been forsaken, the Reviews "would likely have been reviewed and edited by a number of senior CIA officials – including the Deputy General Counsel for Litigation and Investigations, the General Counsel, the Director's Chief of Staff, the Executive Director, and the Deputy Director – before being presented to the Director as finished products." <u>Id.</u>

Several years after the CIA terminated the project, Senator Mark Udall publicly referenced an "internal study" that the agency had allegedly drafted about its former detention and interrogation program.  Catching wind of this, Plaintiff submitted a FOIA request to the agency on December 26, 2013, seeking "any records constituting, discussing, or mentioning the [CIA's] internal study of its detention and interrogation program." Lutz Decl., Exh. A (FOIA Request) at 1.  The request asked for documents related to "the same internal study that the Senate Intelligence Committee asked to be provided to it" and attached a <u>New York Times</u> editorial discussing Udall's reference to the study.  <u>Id.</u>  Leopold additionally requested expedited processing.  <u>See id.</u> at 2.

The government, however, failed to respond to the expedited-processing request by January 13, 2014, which Plaintiff alleges was the response deadline.  <u>See</u> Compl., ¶¶ 15-18.  Wasting no time, Leopold filed suit the following day.  The day after that, the agency issued a letter informing him that it could not process his request because he had not reasonably described the records he sought.  <u>See</u> Lutz Decl., Exh. B (Letter from Michele Meeks, Information and Privacy Coordinator, to Leopold, Jan. 15, 2014).  The parties thereafter engaged in discussions to

narrow his request. Plaintiff ultimately agreed to limit it to "the supposed 'internal study' and to exclude any documents that 'merely mention or discuss' such a study." Lutz Decl., ¶ 7; id., Exh. C (E-mail from Vesper Mei, Senior Counsel, Federal Programs Branch, to Jeffrey Light, Plaintiff's Counsel (Feb. 21, 2014)); id., Exh. C (E-mail from Jeffrey Light to Vesper Mei (Feb. 25, 2014)). The CIA has, accordingly, "interpret[ed] Mr. Leopold's request to be seeking the most current version of the supposed internal study." Lutz Decl., ¶ 7.

The agency asserts, and Leopold does not dispute, that this "internal study" – often referred to in the media as the "Panetta Review" – "is actually [the] series of more than forty draft documents" that the SRT created. Id., ¶ 8. The agency has refused to release any of the documents or any portions of them, relying on FOIA Exemptions 1, 3, and 5. It now moves for summary judgment on the ground that it has properly withheld the Reviews, and Leopold cross-moves, arguing the contrary.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, the Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).

## III.   Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . .  shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions.  See 5 U.S.C. § 552(b); Rose, 425 U.S. at 361.  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See 5

U.S.C. § 552(a)(3); <u>Dep't of Justice v. Reporters Comm. for Freedom of the Press</u>, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" <u>Reporters Comm.</u>, 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ." <u>Nat'l Ass'n of Home Builders v. Norton</u>, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting <u>Dep't of State v. Ray</u>, 502 U.S. 164, 173 (1991)).

In the present case, the CIA asserts that the Reviews are properly withheld in their entirety under Exemption 5's deliberative-process privilege. While it further contends that portions of the Reviews are also protected by Exemption 1 (which covers materials classified by Executive Order) and Exemption 3 (which covers materials specifically exempted from disclosure by statute), the Court need not address these two because Exemption 5 acts as a complete shield.

A.  <u>FOIA Exemption 5</u>

Exemption 5 provides that an agency need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). It thus protects documents that would ordinarily be unavailable to an opposing party through discovery. <u>See</u> <u>United States v. Weber Aircraft Corp.</u>, 465 U.S. 792, 800 (1984); <u>Martin v. Office of Special Counsel</u>, 819 F.2d 1181, 1184-85 (D.C. Cir. 1987) (Exemption 5 "unequivocally" incorporates "all civil discovery rules"). Documents that fall within the attorney-client privilege, the attorney work-product doctrine, and

the deliberative-process privilege are therefore exempt from disclosure.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 148-49 (1975); Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980).  Defendant invokes only the last here.

The deliberative-process privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (internal quotation marks and citation omitted).  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  Id. at 8-9; see also Dow Jones & Co., Inc. v. Dep't of Justice, 917 F.2d 571, 573-74 (D.C. Cir. 1990).  To fall under the protection of the deliberative-process privilege, withheld material must be both "predecisional" and "deliberative."  Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  Material is "predecisional" if it was "generated before the adoption of an agency policy."  Coastal States, 617 F.2d at 866.  It is "deliberative" if it "reflects the give-and-take of the consultative process."  Id.  In the present case, Plaintiff takes issue with the agency's characterization of the documents on both counts.  The Court will thus address these two requirements in turn.

B.  Predecisional

The primary purpose of the "predecisional" requirement is to differentiate between documents "prepared . . . to assist an agency decisionmaker in arriving at his decision" and those drafted "to support a decision already made."  Petroleum Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotation marks and citation omitted).  While documents that fall into the latter category must be disclosed, the CIA asserts here that the Reviews fall into the former because they "were generated to help the Director of the CIA and

other senior Agency leaders make policy decisions related to the SSCI's ongoing study." Lutz

Decl., ¶ 22.  More specifically, had the agency completed the Reviews, "senior leaders could

have used [them] to prepare an accurate and timely response to the Committee's eventual report;

to anticipate developments that might arise in connection with the Committee's study; to inform

interactions with the Committee; and to prepare for interagency discussions within the Executive

Branch regarding the study."  Id.

  Leopold challenges the sufficiency of this explanation, arguing first and foremost that the

CIA is required to "point to a single agency action to which the reviews would contribute," but

has failed to do so.  See Pl.'s Opp. & Cross-Mot. at 2.  In essence, he believes that the agency's

reference to the various potential uses to which the Reviews might have been put is too general,

and that the government must be able to point to a specific decision – *e.g.*, "whether to use

particular methods of interrogation in the future" – to which the documents could have

contributed.  See Pl.'s Reply at 3.  He relies on Paisley v. CIA, 712 F.2d 686 (D.C. Cir. 1983),

and Senate of Puerto Rico ex rel. Judiciary Committee v. Department of Justice, 823 F.2d 574

(D.C. Cir. 1987), to support his position.  In both cases, the D.C. Circuit stated that the

government must be able to "pinpoint an agency decision or policy to which the[] documents

contributed."  Paisley, 712 F.2d at 698; accord Senate of Puerto Rico, 823 F.2d at 585.

  As the CIA points out, however, the D.C. Circuit later clarified in Access Reports v.

Department of Justice, 926 F.2d 1192 (D.C. Cir. 1991), that "in context the language [from those

cases] cannot be taken to require that the document contribute to a single, discrete decision."  Id.

at 1196.  It explained that in those earlier cases, it had been "concerned that there might be 'no

definable decisionmaking process' to which the documents contributed" as a result of the cursory

information that had been provided.  Id. (quoting Paisley, 712 F.2d at 698).  It then made clear

that the exemption is "aimed at protecting [an agency's] decisional <u>process</u>," and that it is unnecessary to identify a <u>specific</u> decision to which withheld materials contributed.  <u>Id.</u>  The court concluded, accordingly, that the Justice Department's assertion that a memo was prepared to aid its "study of how to shepherd [a] bill through Congress" sufficiently defined the decisionmaking process to which the document contributed, and that the agency had sustained its burden of showing that the memo was predecisional.  <u>Id.</u>

   The decisionmaking process identified here is no more vague than the one described in <u>Access Reports</u>.  According to the CIA, the Reviews were created to aid senior agency officials' deliberations about how to respond to the SSCI's investigation into its former program, as well as how to deal with other policy issues that might arise therefrom.  Contrary to Plaintiff's assertions, a finding that the documents are predecisional would not stretch the meaning of the term too far or risk rendering every document exempt because it might someday be used by agency officials to make "various policy decisions."  <u>See</u> Pl.'s Reply at 2.  Here, there was a congressional inquiry underway about a specific CIA program.  That program had already generated considerable international controversy, and senior CIA officials knew that they would have to respond to the Committee's eventual report.  They also knew that they might be called upon to make other decisions stemming from the Committee's study, such as how to prepare for meetings with other agencies on the subject.  The agency was thus engaged in an ongoing, multi-year, deliberative process about how to handle these issues, and the Reviews preceded the agency's final decisions in that process.

   In his Reply, Leopold also seems to take issue with the agency's characterization of the documents as predecisional since they addressed the CIA's <u>former</u> detention and interrogation program.  He notes that "[t]he documents were prepared 'between mid-2009 and mid-2010,'

after President Obama ended the program" and that they "therefore where [*sic*] not designed to assist the CIA in making decisions or formulating policy on whether or how to interrogate detainees as part of the detention and interrogation program."  Pl.'s Reply at 1.

But documents are not postdecisional simply because they address past events.  Indeed, the D.C. Circuit rejected a similar argument in Access Reports.  The plaintiff there contended that a memo about the potential impacts of certain proposed amendments to FOIA could not be considered predecisional because it was drafted after the Department submitted its legislative proposals to Congress.  See Access Reports, 926 F.2d at 1194.  The court explained, however, that the Department had not prepared the memo to explain its past decisions, but instead "as ammunition for the expected fray."  Id. at 1196.  It analogized the memo to "a staffer's preparation of 'talking points' for an agency chief about how to handle a potentially explosive press conference."  Id.  Such talking points, while they may relate to past decisions or events, are predecisional because they are drafted to aid future policy-oriented decisions – *e.g.*, how to respond to press inquiries.  See, e.g., Judicial Watch, Inc. v. Dep't of Homeland Sec., 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (e-mails that post-dated grant of immunity to individual were nonetheless predecisional because they were "generated as part of a continuous process of agency decision making, *viz.*, how to respond to on-going inquiries" from press and Congress); Am. Immigration Council v. Dep't of Homeland Sec., 21 F. Supp. 3d 60, 76 (D.D.C. 2014) (holding privilege applies to "agency deliberations about how to respond to NGO inquiries regarding prior agency actions") (emphasis omitted); see also Nat'l Sec. Archive v. CIA, 752 F.3d 460, 463 (D.C. Cir. 2014) (explaining that agency's official history of event is final agency decision and that draft histories are therefore predecisional).

The Reviews here were not intended to memorialize past decisions.  Rather, they were designed to aid decisions that CIA officials would need to make, going forward, in connection with the Committee's study.  And given the media spotlight pointed at the CIA's program and the SSCI report, there could be little doubt of an "expected fray" or "explosive press conference[s]."

Finally, it is worth noting, as further evidence of their predecisional nature, that the Reviews were written by lower-level employees for use by senior CIA officials.  See Coastal States, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.").  The authors had no authority to speak for the agency about its former detention and interrogation program or its position on the Committee's investigation.  See Lutz Decl., ¶ 23.  The CIA, moreover, has not adopted the Reviews as providing the agency's position on its past tactics or on such methods moving forward.  See id.; see also, e.g., Coastal States, 617 F.2d at 866 (noting predecisional document may lose such status "if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public").  There is, therefore, no concern that their withholding will permit the development of "a body of 'secret law.'"  Coastal States, 617 F.2d at 867.  In fact, the agency's official statements about the Committee's findings are now public.  See, e.g., Statement from Director Brennan on the SSCI Study on the Former Detention and Interrogation Program, Dec. 9, 2014, available at https://www.cia.gov/news-information/pres-releases-statements-2014-press-releases-statements/statement-from-director-brennan-on-ssci-study-on-detention-interrogation-program.html.

In sum, the agency has sustained its burden to show that the Reviews were predecisional.

C.  Deliberative

The parties next spar over whether the documents satisfy the deliberative criterion.

Plaintiff stresses that the deliberative-process privilege does not protect purely factual material.

In his view, the Reviews cannot be withheld because they merely "track" and describe the

information contained in the documents provided to the Committee.  The CIA counters that

although "the Reviews discuss factual material," "the selection and organization of facts in the

Draft Reviews was part of the deliberative process."  Def.'s Mot. at 12.  Their disclosure would,

consequently, reveal the SRT members' policy-oriented judgments and cause the sorts of harms

that the privilege was meant to avoid.  The Government has the better argument here.

While it is true that "[p]urely factual material usually cannot be withheld under

Exemption 5," it can be where "it reflects an 'exercise of discretion and judgment calls'" and

where its exposure would enable the public to probe an agency's deliberative processes.  Ancient

Coin Collectors Guild v. Dep't of State, 641 F.3d 504, 513 (D.C. Cir. 2011) (quoting Mapother,

3 F.3d at 1539).  This is because "the privilege serves to protect the deliberative process itself,

not merely documents containing deliberative material."  Id. at 1537.  "[T]he legitimacy of

withholding" thus "does not turn on whether the material is purely factual in nature or whether it

is already in the public domain, but rather on whether the selection or organization of facts is part

of an agency's deliberative process."  Id. (citing Montrose Chemical Corp. of Cal. v. Train, 491

F.2d 63, 71 (D.C. Cir. 1974)).  And, as Plaintiff acknowledges, "Where an agency claims that

disclosing factual material will reveal its deliberative processes, '[the court] must examine the

information requested in light of the policies and goals that underlie the deliberative process

privilege.'"  Mapother, 3 F.3d at 1537-38 (quoting Wolfe v. Dep't of Health & Human Servs.,

839 F.2d 768, 774 (D.C. Cir. 1988)).

12

In accordance with these principles, this Circuit has previously permitted agencies to withhold factual material that agency staff has compiled through the exercise of discretion about what information would be relevant to an agency official's decisionmaking.  The CIA contends that is precisely what happened here.  It points to <u>Montrose Chemical</u>, for instance, in which the court upheld the government's invocation of the privilege to withhold "two summaries of evidence" from an extensive administrative hearing record.  <u>See</u> 491 F.2d at 64.  Although the parties "agreed that the summaries in question [we]re in large part compilations of facts," their disclosure would have enabled the plaintiff to "prob[e] the decisionmaking process itself."  <u>Id.</u> The staff assistants, after all, had compiled the summaries through the exercise of "judgment as to what record evidence would be important to the Administrator in making his decision . . . ." <u>Id.</u>  Disclosure of the summaries would thus reveal "the evaluation and analysis of the multitudinous facts made by the Administrator's aides and in turn studied by him in making his decision."  <u>Id.</u>

Likewise, in <u>Mapother</u>, the court sustained the agency's exemption claim for the "great bulk" of a report about a world leader even though much of the report could be portrayed as factual.  <u>See</u> 3 F.3d at 1533.  The court explained that, like the staff working on the summaries in <u>Montrose Chemical</u>, the agency staff had "to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and . . . identify the significant issues they encountered along the way."  <u>Id.</u> at 1538.  It further noted that "the selection of the facts thought to be relevant clearly involve[d] 'the formulation or exercise of . . . policy-oriented judgment' or 'the process by which policy is formulated,' in the sense that it require[d] 'exercises of discretion and judgment calls.'"  <u>Id.</u> at 1538-39 (quoting <u>Petroleum Info. Corp.</u>, 976 F.2d at 1435, 1438).  It distinguished such efforts from those that are "'essentially technical' in nature," <u>id.</u> (quoting

Petroleum Info. Corp., 976 F.2d at 1437-38), and concluded that, because "the majority of the . . . factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action," the agency was justified in withholding it.  Id. at 1539.  Other factual materials have been similarly protected where they involved policy-oriented judgments about which facts were pertinent to an agency official's deliberations.  See, e.g., Ancient Coin, 641 F.3d at 513.

Of course, as Plaintiff notes, many factual materials will not be protected. Straightforward, mechanical recitations of fact, for instance, will generally fall outside of the privilege.  Illustrative of this point is a portion of the report in Mapother that the Court ordered the agency to disclose.  Specifically, the "Chronology" section was not exempt because, while "written in narrative form," it was "in substance an inventory, presented in chronological order," of the subject's "ranks, postings, promotions, decorations, wounds, leaves from active duty, educational attainments, and the like."  Mapother, 3 F.3d 1533, 1539.  It "reflect[ed] no point of view," "ha[d] been organized strictly chronologically, not thematically," and "[t]he selection of the categories of facts to be recorded in no way betray[ed] the occasion that gave rise to its compilation."  Id. at 1540; see also, e.g., Petroleum Info. Corp., 976 F.2d at 1437-38 (creating database from existing land-use records was not deliberative as the "essentially technical, record-keeping nature of the . . . task circumscribe[d] the . . . exercise of discretion and judgment calls," and "[t]he technical, objective tenor of the . . . . materials also reduce[d] the likelihood that disclosure would result in public criticism of individual [agency] employees").

Plaintiff further points out that even factual summaries that do require some judgment about which facts to include and which to omit will often be subject to disclosure where they would not reveal anything about an agency's deliberative processes.  In Playboy Enterprises, Inc.

v. Dep't of Justice, 677 F.2d 931 (D.C. Cir. 1982), for instance, the court held that the
Department of Justice could not withhold a report on the activities of a former FBI informant.
While the government had asserted that the entire report "reflect[ed] the choice, weighing and
analysis of facts" from over 800 volumes of materials, the court noted that "[a]nyone making a
report must of necessity select the facts to be mentioned in it" and that "a report does not become
a part of the deliberative process merely because it contains only those facts which the person
making the report thinks material." Id. at 935. Indeed, "[i]f this were not so, every factual report
would be protected as a part of the deliberative process." Id. The court then distinguished the
report from the summaries in Montrose Chemical on the ground that the latter had been
"prepared for the . . . purpose of assisting the Administrator to make a complex decision," while
the report in Playboy Enterprises "was prepared only to inform the Attorney General of facts
which he in turn would make available to members of Congress." Id. Its disclosure, therefore,
would not have exposed the agency's deliberations to public light.

   Leopold's attempts to liken this to Playboy Enterprises and prior cases disclosing factual
materials, however, are unpersuasive. "[U]nlike Playboy Enterprises, the factual material here
was not assembled for an agency actor merely to pass along to outsiders, but rather for purely
internal deliberative purposes." Elec. Privacy Info. Ctr. v. Transp. Sec. Admin., 928 F. Supp. 2d
156, 167-68 (D.D.C. 2013). More specifically, the Reviews were "intended to facilitate or assist
development of the agency's final position on the relevant issue[s]." Nat'l Sec. Archive, 752
F.3d at 463. Senior officials were aware that they would likely be called upon to make a variety
of policy decisions in connection with SSCI's study. Lacking the ability to personally review the
millions of pages turned over to the Committee, they relied on their staff to review the

documents and prepare summaries of the information that the staff thought important to making those decisions.

In further contrast to the report in <u>Playboy Enterprises</u> and other materials that have fallen outside the privilege, the Reviews were not comprehensive, matter-of-fact summaries about the selected topics, nor were they rote recitations of facts.  Rather, the authors strove to write briefing materials that would aid senior officials' decisionmaking.  To do so, they had to "ma[k]e judgments about the salience of particular facts in light of the larger policy issues that senior CIA leaders might face in connection with the SSCI's study."  Lutz Decl., ¶ 25.  They also had to "organize that information in a way that would be most useful to senior CIA officials."  <u>Id.,</u> ¶ 16. The Reviews, consequently, reflected a point of view – namely, what agency personnel thought important enough to bring to senior officials' attention in light of their understanding of the policy issues that the CIA might face as a result of the investigation.  The deliberative nature of the documents, furthermore, is underscored by the fact that even disclosing the topics that agency officials selected for Reviews would expose their internal thought processes – *e.g.*, about the information that they believed necessary to formulate the agency's response to the Committee's report and to make other related decisions.  The Reviews are thus far more akin to the factual summaries found exempt in <u>Montrose Chemical</u> and <u>Mapother</u>.

Plaintiff's remaining arguments are also unavailing.  He maintains, for instance, that because "no senior CIA official reviewed or relied on the reviews, disclosure of the summaries would not reveal what advice senior CIA officials received and how much of it they accepted." Pl.'s Opp. & Cross-Mot. at 5.  That, however, does not change the fact that the Reviews themselves were deliberative.  They were written as part of the agency's consultative process and entailed policy-oriented judgments.  Just because the project was cast aside does not mean that

the documents lose their protection.  This Circuit has repeatedly emphasized that agency

personnel must know from the get-go that their work will not turn into front-page news

regardless of whether a project is ultimately scrapped; were it otherwise, they might temper

everything they write for fear that it will not be protected.  See Nat'l Sec. Archive, 752 F.3d at

463; see also, e.g., Access Reports, 926 F.2d at 1196 ("Any requirement of a specific decision

after the creation of the document would defeat the purpose of the exemption.  At the time of

writing the author could not know whether the decisionmaking process would lead to a clear

decision, establishing the privilege, or fizzle, defeating it.  Hedging his bets, he would be drawn

into precisely the caution, or the Aesopian language, that the exemption seeks to render

unnecessary.") (citation omitted).  Protecting deliberative documents, even if abandoned in their

infancy, thus ensures that agency personnel will feel comfortable being candid in their

communications about policy decisions.

Leopold also contends that because the Reviews did not end up "incorporat[ing] any

feedback from CIA's leadership," disclosing them would not divulge any internal "give-and-

take" about their contents.  Pl.'s Opp. & Cross-Mot. at 5.  But the agency's intended editing

process was not what makes the Reviews deliberative.  Instead, it is their planned role in the

agency's decisionmaking process and the significant discretion that the authors exercised in

order to prepare useful briefing documents on their selected topics.

In the end, requiring disclosure of the Reviews would cause the sort of harm that the

deliberative-process privilege was designed to prevent – i.e., inhibiting frank and open

communications among agency personnel.  See Dudman Comm'ns Corp., 815 F.2d at 1568

("[T]he key question in Exemption 5 cases [is] whether the disclosure of materials would expose

an agency's decisionmaking process in such a way as to discourage candid discussion within the

agency and thereby undermine the agency's ability to perform its functions.").  Had the SRT

known that the Reviews could become public, its members would likely have been tempted to

highlight only the information that would paint the agency's prior actions in a positive light and

to avoid calling attention to information that could have embarrassed the agency or its officials.

See, e.g., Coastal States, 617 F.2d at 866 ("'Human experience teaches that those who expect

public dissemination of their remarks may well temper candor with a concern for appearances

and for their own interests to the detriment of the decisionmaking process.'") (quoting United

States v. Nixon, 418 U.S. 683, 705 (1974)); Dudman Comm'ns, 815 F.2d at 1569 (if agency

believed draft histories would have to be disclosed, editors would likely "place pressure on

authors to write drafts that carefully toe the party line").  Protecting the agency's withholdings in

this case is thus consistent with the purposes of this exemption.

      The Court, in sum, concludes that the Reviews are properly withheld under Exemption

5's deliberative-process privilege.  It further agrees that they may be withheld in full.  While

FOIA requires agencies to release "[a]ny reasonably segregable portion of a record," 5 U.S.C. §

552(b), it is clear that there are no such portions here.  As the agency attests, and as the preceding

discussion makes clear, "[t]he entire documents are pre-decisional, deliberative drafts . . . ."

Lutz Decl., ¶ 26.  Because "the selection of which facts to include [wa]s part and parcel of the

deliberative assessment," no portions can be severed without exposing the deliberative process

itself.  Id.; see, e.g., Nat'l Sec. Archive, 752 F.3d 460, 465 (D.C. Cir. 2014).

**IV.      Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment and deny Plaintiff's.  A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 31, 2015